UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Strio Consulting, Inc.,<br>a Minnesota Corporation,<br><br>    Plaintiff and Counterclaim<br>    Defendant,<br><br>v.<br><br>RocketPower, Inc.,<br>a Delaware Corporation,<br><br>    Defendant and Counterclaim<br>    Plaintiff. | Case No.: 19-CV-01048-ECT-BRT |
| RocketPower, Inc.,<br>a Delaware Corporation,<br><br>    Plaintiff and Counterclaim<br>    Defendant,<br><br>v.<br><br>Strio Consulting, Inc.,<br>a Minnesota Corporation,<br><br>    Defendant and Counterclaim<br>    Plaintiff. | Case No.: 19-CV-01928-ECT-BRT<br><br>**SECOND AMENDED COMPLAINT** |

1.     Plaintiff RocketPower, Inc. seeks a declaratory judgment pursuant to California Code of Civil Procedure sections 1060 et seq., that non-compete provisions in employment agreements — agreements that Strio Consulting, Inc. purported to prepare on behalf of RocketPower and Strio — are void and unenforceable against RocketPower and the joint workers of RocketPower and Strio under California law and on other grounds.

## **THE PARTIES**

2.     RocketPower, Inc., is a Delaware corporation, with its primary place of business located at Two Embarcadero Center, San Francisco, California.

3.     Strio Consulting, Inc., is a Minnesota corporation with its primary place of business located at 1390 Neal Avenue North, Lake Elmo, Minnesota.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction and is the appropriate venue because Strio, through its relationship with RocketPower, availed itself of the protection of the laws of the State of California, and liability arose in San Francisco, California, where RocketPower suffered injury resulting from Strio's conduct.  Strio's liability, as set forth in this First Amended Complaint, exceeds $25,000.

## GENERAL ALLEGATIONS

5.     RocketPower provides talent solutions to rapidly growing companies by: 1) providing recruiting process outsourcing/contract recruiters; 2) providing outsourced/contract staffing for hourly positions such as autonomous vehicle operators and customer service specialists; and 3) providing executive search services.

6.     Strio is a consulting business that provides back office services for RocketPower and RocketPower's clients including payroll, employee benefits, and related services.

7.     RocketPower establishes relationships and contracts with clients who are companies in need of workers.

8.     RocketPower's clients contract with RocketPower for assistance with finding and hiring, placement, management, and supervision of workers to meet their business needs.  All relevant client contracts are between the client and RocketPower. Strio is not a party to any relevant client contracts.

### RocketPower/Strio Joint Employment of Workers

9.     RocketPower and Strio have a verbal agreement to provide different services to RocketPower's clients, with RocketPower being primarily responsible for advertising, screening, and identifying potential employees who will meet their clients' employment needs as follows: 1) in the Recruiting Process Outsourcing line of business,

RocketPower directs the operational performance of the employees; 2) in the Outsourced/Contract staffing line of business, RocketPower clients direct the operations performance of the employees; and 3) in the Executive Search staffing line of business, RocketPower provides primary operational direction.

10.     RocketPower uses Strio services for some of its services to clients, but not all.

11.     RocketPower and Strio do not have an exclusive business relationship. RocketPower/Strio's joint workers are not prohibited from working on assignments that involve RocketPower clients with whom Strio has no contacts, involvement, or relationships.

12.     When RocketPower's clients identify a hiring need, they contact RocketPower, who then advertises the position and begins soliciting qualified candidates to apply for the position.

13.     The team that screens and then extends offers to the applicants is made up of both RocketPower-payroll and Strio-payroll employees.  The operational control and business processes are governed by RocketPower.  A verbal offer to the candidate is made telephonically by either a RocketPower or Strio employee, who is a member of that team.

14.     Following the verbal offer made to the candidate, the written confirmation is sent by the same RocketPower or Strio employee who made the verbal offer to the candidate.

15.     The RocketPower or Strio employee who sent the written offer then alerts a recruiting coordinator who is also operationally controlled by RocketPower.  Strio employees execute the required final paperwork; those specific internal support Strio employees are paid 50% by RocketPower (even though these Strio employees are not joint workers).  The required final paperwork includes a statement of work that defines the scope of the new hire's job responsibilities based on RocketPower's specifications,

and an employment agreement.  The employment agreements at issue here were drafted by Strio, without RocketPower input.  The employment agreement is then executed electronically by the new hire.

16.     After the new hire signs the employment agreement, he or she becomes a joint employee of RocketPower and Strio. Strio is responsible for providing payroll services, employee benefits, and other day-to-day services for the new hire, at RocketPower's specification.

17.     RocketPower funds 100% of the billable workers' wages.  The workers are directed 100% by RocketPower or RocketPower clients.

18.     The workers are joint employees of both RocketPower and Strio. Depending on the line of business, RocketPower, or RocketPower's clients, control and supervise the day-to-day activities of the workers.  Strio provides limited services and is only responsible for employee relations matters such as disciplinary issues and termination actions, done in collaboration with RocketPower.

19.     RocketPower and Strio are joint employers of the workers for at least the following reasons:

    a.  RocketPower supervises and controls the workers' schedules and conditions of employment;

    b.  RocketPower determines the rate and method of payment for all of the billable employees.  For the few workers who are Strio internal overhead employees only, Strio determines the rate and method of payment with RocketPower's input;

    c.  Many of the Agreements expressly state that the workers are employees of both RocketPower and Strio;

    d.  The Employee Handbook states that the workers are employees of both RocketPower and Strio;

    e.  Onboarding of the workers is done by both RocketPower and Strio;

    f.   Both RocketPower and Strio have responded to employee complaints from various agencies as joint-employers;

    g.   Responsibility under the Agreements could pass from one entity to the other without material changes; and

    h.   The workers work exclusively for RocketPower clients.  As such, Strio cannot enforce the restrictive covenants of the Agreements against RocketPower, its joint-employer and intended co-beneficiary of the restrictive covenants.

20.    Strio does not assign pre-existing Strio employees to RocketPower contracted assignments.

21.    RocketPower initiates requests for hiring new employees to work on RocketPower contracted assignments.

22.    RocketPower manages the hiring process for hiring new hires for RocketPower contracted assignments.

23.    Strio does not assign joint employees to any new projects where Strio has a direct contact with a RocketPower client when a RocketPower contract assignment ends.

24.    The joint employment of RocketPower/Strio's employees is made possible exclusively by RocketPower's contracted client relationships.

25.    Strio does not provide specialized training to RocketPower/Strio joint employees.

26.    There is no Strio proprietary confidential information promised to or given to the joint employees.

27.    There are no Strio trade secrets provided to the joint employees.

28.    There is no customer goodwill on behalf of Strio retained by the employees; in fact, many RocketPower contracted clients do not even know that Strio exists.

29.     RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families.

30.     RocketPower and Strio are complementary businesses who do not compete for the same clients.

31.     RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

32.     RocketPower invoices all of its clients directly for the services its workers provide for them.

33.     RocketPower's clients generally submit payment for the invoiced work with 25 to 45 days of receiving the payment.

34.     After receiving payment from its clients, RocketPower deposits the funds in a joint account shared by RocketPower and Strio.

35.     RocketPower/Strio currently jointly employ approximately 165 workers and approximately 86 of those joint workers reside and work primarily in California.

### The Agreements at Issue

36.     There are at least two types of Employment Agreements that Strio has been presenting to the joint workers for signature.

37.     The first is styled "Independent Contractor Agreement" with a "Statement of Work" attached.  The second is styled "Consultant Employment Agreement" with a "Statement of Work" attached.  The two agreements are referred to hereafter collectively as "the Worker Agreements."

38.     Some of Worker Agreements purport to be between the worker and Strio only.  Some of the Worker Agreements purport to be between the worker and both Strio and RocketPower.

39.     The material provisions of the Worker Agreements are essentially identical.

40.     The Worker Agreements provide that the workers are hired as "independent contractors" to serve one or more clients.

41.     The workers are also "at will" employees who could be terminated at any time without cause.

42.     The Worker Agreements include a non-competition clause that states:

> Non-Competition.[1]
>
> During the term of this Agreement and for one year after the termination of Contractor's relationship with SC/RP[2] for whatever reason, whether such termination was by SC/RP or Contractor, and whether with or without cause, Contractor agrees that he or she shall not, as a principal, employer, stockholder, partner, agent, consultant, independent contractor, employee or in any other individual representative capacity:
>
> 1)      Provide or attempt to provide directly or indirectly, or advise others of the opportunity to provide, any Services to any Client:
>
>> a.      To which, within six (6) months prior to termination of Contractor's Agreement, Contractor has provided services in any capacity on behalf of SC/RP, or
>>
>> b.      To which, within ninety (90) days prior to such termination of Contractor's Agreement, Contractor has been introduced or about which Contractor has received information through SC/RP or through any Client for which Contractor has performed Services in any capacity on behalf of SC/RP or;
>
> 2)      Retain or attempt to retain, directly or indirectly, for Contractor or any other party, the Services of any person, including any of SC/RP's employees, who was providing

---

[1] The Strio worker agreement contains the identical provision, but only purports to assert the Non-Competition obligation for the benefit of Strio, not both Strio and RocketPower, as in the other agreements.

[2] As defined in the Worker Agreement, "SC" is "Strio" and "RP" is RocketPower.

services to or on behalf of SC/RP within ninety (90) day before the termination of Contractor's Agreement, and to whom Contractor has been introduced or about which Contractor has performed Services in any capacity on behalf of SC/RP. For purposes of this paragraph, the term "Client" includes any affiliates, customers and clients of SC/RP's Clients for which Contractor performed or was assigned to perform Services under this Agreement.

43.   The non-compete provisions contain no geographic or other scope limitations.

44.   The exact terms of the Worker Agreements, including restrictive covenants, were not negotiated pre-offer of employment.

45.   The Worker Agreements contain a provision that states the agreement "shall be governed, construed and determined according to the laws of the State of Minnesota."

46.   The Worker Agreements requires RocketPower/Strio employees to resolve disputes through arbitration in Minneapolis, Minnesota.

47.   In direct conflict, in a separate section, the Worker Agreements also state: "[t]his Agreement will be governed by the law of the state in which the Services are primarily performed."

48.   RocketPower did not review or approve the non-competition or choice of law provisions in the Worker Agreements.

49.   Section 925 of the California Labor Code prohibits employers from requiring employees who primarily reside in California to adjudicate claims that arise in California outside of California, or from depriving those employees of "substantive protection[s] of California law with respect to a controversy arising in California."

50.   Pursuant to Section 925, such requirements are voidable.

51.     Section 925 applies to all employment agreements executed on or after January 1, 2017.

52.     All of the Worker Agreements at issue in this case were executed after January 1, 2017.

53.     California Business and Professions Code section 16600 provides: "Except as provided in this chapter, every contract by which any one is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

54.     Sections 16600 through 16607 do not include an exception allowing RocketPower/Strio to restrain its joint employees residing in California from engaging in their lawful possessions, trades, or businesses in the state of California.

### Strio's Failure to Make Payroll to Joint Employees in December 2018

55.     Strio failed to make payroll for at least 20 of the joint workers on at least two separate occasions:  November 30, 2018 and December 14, 2018.

56.     On information and belief, on other occasions in or about December 2018/January 2019, Strio grossly overpaid the joint workers and then, in an effort to correct its over-payment, clawed back more than had been overpaid.  One example involved a joint worker who reported that she was paid $80,0000.00 for one pay period. When Strio attempted to correct the situation, it withdrew not only the overpayment, but also the amount that was actually due and owing for payroll that pay period.

57.     As mentioned, on November 30, 2018, Strio missed payroll for a number of joint workers.  RocketPower was required to step in and pay some of the employees directly via PayPal, which it did the following day.

58.     Strio was assigned to pay other employees through a similar method, but on information and belief, these payments were made with significant delay and from personal bank accounts, not from Strio-associated accounts.

**Strio's Threats Against RocketPower with Regard to Joint Employees**

59.     On December 14, 2018, Strio's CEO, Caleb Fullhart, sent RocketPower's Chief Executive Officer, Mat Caldwell, the following hostile and threatening text message during a discussion around Strio's repeated failure to make payroll and making accounts receivable/accounts payable more accurate for both firms:

> Caleb:  When are you back next week?  I am coming out to SFO so we can chat face to face
>
> Mat:   Next week won't work.  Is Doris contacting Byron.
>
> Caleb: I already messaged him – if you aren't available face to face, we need to talk soon. You fucking pissing me off man. And you are fucking with my money.  Do not forget who holds the paper on every single employee (except Jeff and Jackie).  If you want the nuclear option you will get it.
>
> Mat:  Dude—don't go there.  This is not what either of us wants.

60.     Minted is a California based employer who has contracted with RocketPower for assistance with employee recruitment and staffing needs.

61.     Reflektive is a California based employer that has contracted with RocketPower for assistance with employee recruitment and staffing needs.

62.     Paula-Anne Sherron was hired by RocketPower to work for Minted.

63.     On July 10, 2018, Sherron signed a Consultant Employment Agreement ("Sherron Agreement").

64.     On January 29, 2018, Christine Covert was hired by RocketPower/Strio to work for Reflektive.

65.     Ms. Covert's Statement of Work identified Mat Caldwell, CEO of RocketPower, as Reflektive's client contact.

66.     On January 29, 2018, Ms. Covert signed a Consultant Employment Agreement ("Covert Agreement").[3]

67.     Pursuant to their agreements, Ms. Covert and Ms. Sherron were hired as "independent contractors" to serve one more clients.

68.     They were also "at will" employees who could be terminated at any time without cause.

69.     Both the Sherron and Covert Agreements contained the non-competition clause set forth in Paragraph 42 above.[4]

70.     Both Ms. Sherron and Ms. Covert work in California.

71.     Both the Sherron and Covert Agreements contain the resolution of disputes provision and the conflicting choice of law provisions described in Paragraphs 45-47 above.

72.     RocketPower did not review or approve the non-competition or choice of law provisions in the Sherron and Covert Agreements.

73.     True to his threats, on April 22, 2019, Mr. Fullhart, through Strio's counsel, Kate Bischoff, sent a letter to a client of RocketPower, namely Saki Kravitz of Minted ("Kravitz Letter"), regarding Minted's direct hiring of Ms. Sherron.

74.     Strio had knowledge that both Ms. Sherron and Ms. Covert were joint employees of RocketPower and Strio.

75.     Strio also had knowledge that Ms. Sherron and Ms. Covert had been placed with RocketPower clients who had conversion provisions in their agreements with RocketPower.  Specifically, the Master Services Agreements that RocketPower had with

---

[3]  The relevant terms of the Sherron and Covert Employment Agreements that are at issue in this action are identical.

[4]  Both the Sherron and Covert Agreements purport to be with Strio only, not RocketPower and Strio, even though Ms. Sherron and Ms. Covert were jointly employed by RocketPower and Strio.

its clients allowed clients to directly hire the joint employees that had been placed with them in exchange for paying a fee.

76.     Prior to Minted offering Ms. Sherron full time employment, Minted and Ms. Sherron had both asked Mr. Caldwell if Minted could convert Ms. Sherron to a Minted employee.

77.     Mr. Caldwell discussed this request with Mr. Fullhart several times before Minted hired Ms. Sherron as a full time employee, and long before Strio sent the Kravitz letter.

78.     In addition to agreeing to Ms. Sherron's conversion, Mr. Caldwell also agreed to waive the conversion fee Minted would have otherwise paid because Ms. Sherron had complained to Minted that Strio had failed to pay or otherwise made mistakes when issuing Ms. Sherron's paycheck.

79.     Mr. Fullhart was upset that RocketPower had agreed to waive the conversion fee, even though the reason Mr. Caldwell had waived the fee was because Strio had repeatedly failed to properly pay Ms. Sherron for the work she had done at Minted.

80.     Strio had further knowledge that due to the joint employment arrangement, RocketPower had certain rights with respect to the employment of Ms. Sherron and Ms. Covert.

81.     Strio had further knowledge that sending letters to RocketPower's clients would create a high degree of probable harm to RocketPower, and upon information and belief, intended to do such harm.

82.     Based on the prior threats, Strio intended to cause injury to RocketPower by sending the Kravitz Letter.

83.     Upon information and belief, Strio sent the Kravitz Letter with willful and conscious disregard for RocketPower's rights.

84.     Minted is a client of RocketPower and does not have a contractual relationship with Strio.

85.     Minted is located in San Francisco, California and Ms. Sherron lives in and works primarily in California.

86.     Ms. Sherron had previously been a joint employee of RocketPower/Strio, working on a Minted engagement.

87.     In the Kravitz Letter, Ms. Bischoff threatened Minted with legal action based on Ms. Sherron's alleged breach of the Sherron Agreement that she had signed when she became a joint employee of RocketPower/Strio.[5]

88.     Ms. Bischoff also made negative and disparaging comments about RocketPower's CEO, Mat Caldwell, and misrepresented the nature of Ms. Sherron's relationship with both Strio and RocketPower.

89.     Although Ms. Sherron had been a joint employee of RocketPower/Strio, and had been placed with Minted based on RocketPower's contractual relationship with Minted, Ms. Bischoff misrepresented that Ms. Sherron had been the sole employee of Strio.  Indeed, Ms. Sherron's cost was paid 100% by RocketPower, even though her work created a 50% profit split for Strio.

90.     Prior to Ms. Sherron accepting a full-time position with Minted, Minted contacted RocketPower's CEO, Mat Caldwell, and requested permission to offer Ms. Sherron full-time employment with Minted.

91.     Mr. Caldwell approved Minted's request.

92.     Despite the fact that Ms. Sherron had been a joint employee of RocketPower/Strio and had been placed with Minted based on RocketPower's relationship with Minted, Ms. Bischoff asserted that Mr. Caldwell did "not have the authority to approve" a waiver of Ms. Sherron's unenforceable non-compete clause.

---

[5] RocketPower includes this allegation not because RocketPower seeks to impose liability based on threats of litigation — it does not. Rather, RocketPower seeks to provide a full picture of events.

93.     Ms. Bischoff's letter disparaged Mr. Caldwell by representing that he lacked the authority to allow one of his clients to offer former employees full time employment with one of RocketPower's clients, per the standard conversion provision[6] in RocketPower's Master Services Agreement with its clients which from Strio has continuously benefitted, and implying that neither Strio nor Minted had any knowledge of or connection to RocketPower.

94.     Strio had knowledge of the terms of the Master Services Agreement and made statements which misrepresented the terms of the Strio and RocketPower relationship.

95.     Strio also omitted material information regarding the same and Mr. Caldwell's authority with respect to the joint employees.

96.     On April 22, 2019, Ms. Bischoff sent a letter to Ms. Covert indicating that she had breached her Agreement with Strio.

97.     Ms. Covert was, in fact, a joint employee of RocketPower/Strio.

98.     Ms. Bischoff knowingly and, upon information and belief, intentionally misrepresented that Ms. Covert had obtained employment at several locations, including Reflektive, Aptible, and Open Door through Strio's "client, RocketPower," when in fact Ms. Covert was a joint employee of RocketPower/Strio.  Each of those clients for whom Ms. Covert was placed to perform services was a client of RocketPower's, not Strio's. Indeed, Ms. Covert's work was paid 100% by RocketPower, even though her work created a 50% profit split for Strio.

99.     In her letter, Ms. Bischoff threatened RocketPower's employee with legal action for providing services she was contractually entitled to perform.

100.     Strio intentionally misrepresented a material fact, namely that it was the sole employer of RocketPower/Strio joint employees to Minted and, upon information

---

[6] The Master Services Agreement gives RocketPower the authority, and imposes a contractual obligation on RocketPower, to allow its clients to offer full time employment to workers that RocketPower has placed with its clients.

and belief, intentionally misrepresented the same material fact to other RocketPower clients (together the "Unauthorized Communications").

101.   Strio made the statements in the Kravitz Letter and other Unauthorized Communications with knowledge that information therein was false, and acted with intent by making these false statements in the Unauthorized Communications.

102.   On April 17, 2019, counsel for RocketPower sent a letter to Strio and its counsel notifying them that Nuro, one of RocketPower's clients, had informed RocketPower that Robin Schooling from Strio had contacted Nuro and indicated that Nuro's drivers "work for Strio."  The Nuro executive had no idea who Ms. Schooling or Strio were and contacted RocketPower to inquire about Ms. Schooling and Strio. RocketPower informed Nuro that Strio provides services for RocketPower's employees. During this conversation with RocketPower, Nuro's executive made clear that Nuro wanted all executive communications to go through RocketPower only.

103.   RocketPower's counsel also conveyed to Strio that Strio must not contact RocketPower's clients without first obtaining RocketPower's express permission.

104.   RocketPower also warned Strio that contacting RocketPower's clients directly interfered with RocketPower's contractual relationships.

105.   Strio was, therefore, on notice of RocketPower's rights and the potential risk that Strio's Unauthorized Communications with RocketPower's clients would cause damage to RocketPower.

106.   Strio's counsel responded with a letter dated April 19, 2019.  Enclosed in that letter were the Sherron and Covert Agreements, both joint employees of RocketPower/Strio.

107.   Strio's April 19, 2019 letter threatened litigation against RocketPower based on the unenforceable non-competition and non-solicitation clauses in the Sherron and Covert Agreements:

> [M]y client has been made aware of multiple Strio employees and contractors who have been solicited by RocketPower to work on non-Strio projects for which Strio is not being compensated. I have enclosed herewith copies of the contracts between Strio and two of its contractors, Paula-Anne Sherron and Christine Covert, who have been improperly solicited by RocketPower to work on such projects. Be advised that any work performed by Strio employees or contactors on such projects constitutes a breach of their respective contracts with Strio and any efforts by RocketPower to solicit, encourage, or entice Strio employees to work on such projects, or otherwise breach their contracts, constitutes unlawful interference with those contracts.

108. Ms. Sherron and Ms. Covert, and the rest of the joint employees, were joint employees of RocketPower and Strio solely because of RocketPower's contractual relationships with its client base.

109. Absent RocketPower's client base, Ms. Sherron, Ms. Covert and the rest of the joint employees would not have been joint employees of RocketPower and Strio.

110. As joint employees of RocketPower/Strio, Ms. Sherron and Ms. Covert performed work primarily in the state of California.

111. As such, the non-competition clauses of their respective employment agreements are void and unenforceable under California law.

112. Regardless, as its joint employer, RocketPower has the authority to waive any restrictive covenants Strio attempted to impose on their joint employees.

113. Upon information and belief, Strio has contacted other RocketPower clients and employees and made disparaging comments about RocketPower, Mr. Caldwell, and other RocketPower employees.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

114. RocketPower realleges and incorporates paragraphs 1–99 of this First Amended Complaint as if fully set forth herein.

115.   A justiciable controversy exists as to whether the restrictive covenants and choice of law provisions of the Worker Agreements are enforceable.

116.   There is a present and actual controversy between RocketPower and Strio.

117.   The parties' interests are adverse.

118.   Strio is threatening to enforce a restrictive covenant, including non-compete and non-solicitation provisions, against joint-employees of Strio and RocketPower without RocketPower's consent.  Strio is also claiming that RocketPower has intentionally interfered with Strio's contractual relationships with Strio's purported employees and contractors, including those restrictive covenants (even though those workers are jointly employed by both RocketPower and Strio).

119.   RocketPower contends that the restrictive covenant provisions of the Agreements are unenforceable as they relate to RocketPower and the joint workers for at least the following reasons:

   a.   The non-compete provisions of the Agreements are unenforceable under California law and cannot be enforced against any California worker pursuant to California Business and Professions Code section 16600, irrespective of any choice of law provision, under California Labor Code section 925;

   b.   RocketPower and Strio are joint employers of the workers for at least the following reasons:

      i.   RocketPower supervises and controls the workers' schedules and conditions of employment;

      ii.   RocketPower determines the rate and method of payment for all of the billable employees.  For the few employees who are Strio internal overhead only, Strio determines the rate and method of payment with RocketPower's input;

iii.   Many of the Agreements expressly state that the workers are employees of both RocketPower and Strio;

iv.   The Employee Handbook states that the workers are employees of both RocketPower and Strio;

v.   Onboarding of employees is done by both RocketPower and Strio;

vi.   Both have responded to employee complaints from various agencies as joint-employers;

vii.   Responsibility under the Agreements could pass from one entity to the other without material changes; and

viii.   The workers work exclusively for RocketPower clients.  As such, Strio cannot enforce the restrictive covenants of the Worker Agreements against RocketPower, a joint-employer and intended co-beneficiary of the restrictive covenants;

c.   The non-compete provisions of the Worker Agreements are overbroad, and contain no geographical or other scope limitations;

d.   The restrictive covenant and choice of law provisions of the Worker Agreements were not negotiated pre-offer of employment;

e.   The restrictive covenant provisions of the Worker Agreements are not supported by additional consideration;

f.   Strio cannot enforce the Worker Agreements pursuant to the doctrines of unclean hands and/or first breach, due to its failure to make payroll for the workers on at least two  occasions in November and December 2018;

g.   The Worker Agreements are vague and ambiguous in at least the following ways:

i.   The Worker Agreements purport to be both an "independent contractor" agreement and "employment" agreement;

ii.   The Worker Agreements contain two inconsistent choice of law

provisions, one stating that the Worker Agreements "shall be governed, construed, and determined according to the laws of the State of Minnesota," and the other stating that the Worker Agreements "will be governed by the law of the state in which the Services are primarily performed";

h. Strio does not provide specialized training to RocketPower/Strio joint employees;

i. There is no Strio proprietary confidential information promised to or given to the joint employees;

j. There are no Strio trade secrets provided to the joint employees;

k. There is no customer goodwill on behalf of Strio retained by the employees, in fact many RocketPower contracted clients do not even know that Strio exists;

l. The majority of RocketPower/Strio joint employees are low to middle income hourly employees and enforcement of non-competes interferes with their ability to work and provide a living for themselves and their families;

m. RocketPower and Strio are complementary businesses who do not compete for the same clients; and

n. RocketPower and Strio do not have a non-solicitation or non-compete agreement with each other.

120.    RocketPower has a legally protectable interest in its employment relationship with the workers and in its contractual relationship with its clients and seeks to preserve those interests through this declaratory judgment.

121.    These issues are ripe for the Court's determination.

122.    Accordingly, RocketPower seeks a declaratory judgment from this Court that the restrictive covenant and choice of law provisions of the Worker Agreements are

invalid and unenforceable with regard to RocketPower and the joint workers of RocketPower and Strio.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Contractual Relations)

123.    RocketPower realleges and incorporates paragraphs 1–108 of this First Amended Complaint as if fully set forth herein.

124.    RocketPower has binding and enforceable agreements with its clients, including, but not limited to: Nuro, Minted, Reflektive and numerous other growing companies to provide advertising, screening, and identifying potential employees that will meet their clients' employment needs as follows: 1) in the recruiting process outsourcing line of business, RocketPower directs the operational performance of the employees; 2) in the staffing line of business, RocketPower directs the operations performance of the employees; and 3) in the staffing line of business, the clients provide primary operational direction.

125.    Strio knew of these contracts as part of its work with RocketPower.

126.    Strio also knew that the individuals placed with RocketPower's clients as part of the arrangement between RocketPower and Strio were joint employees and that RocketPower had certain rights with respect to those employees.

127.    Upon information and belief, Strio has intentionally caused or induced RocketPower's clients to breach their agreements with RocketPower by, among other things, defaming and disparaging Mat Caldwell, CEO of RocketPower, and intentionally misrepresenting the status of the workers as exclusive employees of Strio, rather than what they truly are, joint employees of both RocketPower and Strio.

128.    As evidenced by the text message exchange in Paragraph 59, Strio's Unauthorized Communications were undertaken with a high degree of awareness and knowledge that such action carried a high probability of causing injury to RocketPower.

129.     Strio's Unauthorized Communications were also undertaken with an intentional disregard to the rights of RocketPower, including its rights as a joint employer and RocketPower's contractual obligations to its clients.

130.     Strio's actions were without justification.

131.     Strio acted wrongfully, with an improper purpose, and by improper means.

132.     As a result of Strio's interference with the contractual and business relations, RocketPower has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages.

133.     Because Strio's interference with RocketPower's contractual relations is causing and will continue to cause immediate and irreparable harm, it justifies the Court's imposition of preliminary and permanent injunctive relief.

134.     Because Strio's interference with RocketPower's contractual and business relations was willful, malicious, and in reckless disregard for the rights of others, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

135.     When Strio sent the Unauthorized Communications to RocketPower's clients and joint and/or former employees, Strio acted with knowledge that it was intentionally misrepresenting and intentionally disregarding material facts, and that the Unauthorized Communications created a high probability of injury to RocketPower.

136.     Strio's Unauthorized Communications intentionally misrepresented facts which were known to Strio.

137.     Therefore, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Advantage)

138.     RocketPower realleges and incorporates paragraphs 1–117 of this First Amended Complaint as if fully set forth herein.

139.    RocketPower has business relationships with its clients, including, but not limited to: Nuro, Minted, Reflektive and numerous other growing companies concerning advertising, screening, and identifying potential employees that will meet their clients' employment needs.  These relationships resulted in economic benefit to RocketPower.

140.    Strio knew of these economic relationships as part of its work with RocketPower.

141.    Strio knew or should have known that these relationships would be disrupted if it failed to act with reasonable care.

142.    Strio failed to act with reasonable care by, among other things defaming and disparaging Mat Caldwell, CEO of RocketPower, and misrepresenting the status of the workers as exclusive employees of Strio, rather than what they truly are, joint employees of both RocketPower and Strio.

143.    Strio's actions were without justification.

144.    RocketPower's relationships with its clients were disrupted.

145.    Strio acted wrongfully, with an improper purpose, and by improper means.

146.    As a result of Strio's interference with the contractual and business relations, RocketPower has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages.

147.    Because Strio's interference with RocketPower's prospective economic relations is causing and will continue to cause immediate and irreparable harm, it justifies the Court's imposition of preliminary and permanent injunctive relief.

148.    Because Strio's interference with RocketPower's prospective advantage was willful, malicious, and in reckless disregard for the rights of others, RocketPower is entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Unfair Competition — Business & Professions Code § 17200 et seq.)

149.   RocketPower realleges and incorporates paragraphs 1–128 of this First Amended Complaint as if fully set forth herein.

150.   Strio, by engaging in the wrongful conduct alleged in this First Amended Complaint, engaged in unlawful, unfair, and/or fraudulent business practices within the meaning of California Business and Professions Code section 17200 et seq. (the "Unfair Competition Law").

151.   Use of covenants not to compete, in violation of Business and Professions Code section 16600, is an unlawful business practice actionable as unfair competition under the Unfair Competition Law.

152.   Soliciting employees to sign covenants not to compete, which are void under Business and Professions Code section 16600, without informing the employees that the provision is void, is an unfair and/or fraudulent business practice under the Unfair Competition Law.

153.   Requiring employees who primarily reside in California to adjudicate claims that arise in California outside of California, or from depriving those employees of "substantive protection[s] of California law with respect to a controversy arising in California," violates California Labor Code, section 925.

154.   Requiring employees to adjudicate claims outside of California and depriving employees of the substantive protections of California law, in violation of California Labor Code section 925, is an unfair and/or fraudulent business practice under the Unfair Competition Law.

155.   Strio sought and obtained employee signatures on agreements containing covenants not to compete that are void under Business and Professions Code section 16600.

156.   Strio sought and obtained employee signatures on agreements containing restrictions contrary to Labor Code section 925.

157.   RocketPower lost money and/or property as a result of Strio's unlawful, unfair, and/or fraudulent business practices concerning covenants not to compete and deprivation of the California forum and law, impairing RocketPower's business relationships and its ability to place talented individuals with client companies.

158.   Strio's violation of the Unfair Competition Law entitles RocketPower to restitution and disgorgement of profit and revenue obtained by Strio as a result of such wrongful business conduct, in an amount according to proof.

159.   RocketPower is entitled to declaratory and injunctive relief under the Unfair Competition Law. It lacks an adequate remedy at law because of the irreparable and unquantifiable ongoing injury that results from Strio's unfair competition. California law authorizes injunctive relief to protect businesses from unfair competition.

## **PLAINTIFF'S NEED FOR INJUNCTIVE RELIEF**

160.   To prevent further intentional interference with RocketPower's contractual and prospective economic relations, it is reasonable and necessary that Strio be temporarily and permanently enjoined from misrepresenting the status of the workers' relationship with RocketPower, from disparaging and defaming Mat Caldwell, CEO of RocketPower, and from contacting RocketPower clients and joint employees seeking to solicit signatures on agreements containing unenforceable restrictive covenants.

161.   As discussed in, among others, paragraphs 109 through 128, RocketPower will prevail on the merits on its common-law claims.

162.   As discussed in, among others, paragraphs 116, 127, and 129, RocketPower will suffer immediate and irreparable harm, and cannot be sufficiently compensated by a judgment.

163.    While RocketPower will suffer immediate and irreparable harm in the absence of preliminary and permanent injunctive relief, Strio will suffer no comparable loss from the imposition of injunctive relief.

164.    The imposition of preliminary and permanent injunctive relief will serve public policy goals, including but not limited to fair competition and the freedom of employees to move without restraint on future work, as codified in California Business and Professions Code section 16600.

### PRAYER FOR RELIEF

WHEREFORE, RocketPower respectfully requests judgment against Strio as follows:

1.    A declaratory judgment that from this Court that the restrictive covenant and choice of law provisions of the Worker Agreements are invalid and unenforceable with regard to RocketPower and the joint workers of RocketPower and Strio.

2.    For all actual damages, plus interest, in an amount to be determined at trial;

3.    For punitive damages;

4.    For attorneys' fees and costs as allowed by law;

5.    For all costs and expenses of collection incurred through the collection of judgment, including reasonable attorneys' fees and legal expenses;

6.    For a temporary and permanent injunction prohibiting Strio from: (1) misrepresenting the status of the workers' relationship with RocketPower; (2) disparaging and defaming Mat Caldwell, CEO of RocketPower; (3) contacting RocketPower clients and joint employees regarding the unenforceable restrictive covenants; (4) further interfering with RocketPower's current and prospective business relations; and (5) from engaging in other conduct that the Court may restrict in aid of these injunctions.

7.    For such other relief as the Court deems just and proper.

Dated:   March 27, 2020                    Respectfully submitted,


                                           **ANTHONY OSTLUND**
                                           **BAER & LOUWAGIE P.A.**


                                           *s/Courtland C. Merrill*
                                           Courtland C. Merrill (#311984)
                                           3600 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, Minnesota 55402
                                           Telephone: 612-349-6969
                                           Facsimile: 612-349-6996
                                           cmerrill@anthonyostlund.com

                                               and

                                           Lisa R. Petersen (*admitted pro hac*)
                                           Cohne Kinghorn
                                           111 East Broadway, 11th Floor
                                           Salt Lake City, UT 84111
                                           Telephone: 801-415-0121
                                           Facsimile: 801-363-4378
                                           lpetersen@ck.law

                                           *Attorneys for Defendant RocketPower, Inc.*